**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**FILED**

NOV 1 9 2007

~~U.S. DISTRICT COURT~~
~~WHEELING, WV 26003~~

RONALD P. KELLEY,

      **Plaintiff,**

*vs.*
                         **Civil Action No.  5:06CV142**
                         **(Judge Frederick P.  Stamp, Jr.)**

**MICHAEL J. ASTRUE,**[1]
**COMMISSIONER OF SOCIAL SECURITY,**
Commissioner of Social Security,

      **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

Ronald P. Kelly brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to obtain

judicial review of a final decision of the Commissioner of Social Security ("Defendant" and

sometimes "Commissioner") denying his claims for Supplemental Security Income ("SSI") and

Disability Insurance Benefits ("DIB") under Titles XVI and II, respectively, of the Social Security

Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f.  The matter is awaiting decision on cross motions

for summary judgment and has been referred to the undersigned United States Magistrate Judge for

submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B);

Fed. R. Civ. P. 72(b); Standing Order No.6.

### I.  Procedural History

Ronald P. Kelly ("Plaintiff") filed an application for SSI and DIB on July 26, 2004, alleging

---

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security.
Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue should be
substituted, therefore, for former Commissioner Jo Anne B. Barnhart (or Acting Commissioner
Linda L. McMahon [if the caption was changed previously]) as the defendant in this suit.  No
further action need be taken to continue this suit by reason of the last sentence of section 205(g)
of the Social Security Act, 42 U.S.C. §405(g).

disability since January 14, 2004, due to back, shoulder, and ankle pain (R. 33, 50-52, 60). The state agency denied Plaintiff's applications initially and on reconsideration (R. 31-32). Plaintiff requested a hearing, which Administrative Law Judge Steven Slahta ("ALJ") held on March 29, 2007, at which Plaintiff, represented by counsel, Jennifer LaRosa, and John Panza, a vocational expert ("VE") testified (R. 251-68 ). On April 29, 2006, the ALJ entered a decision finding Plaintiff was not disabled because he could perform work that existed in significant numbers in both the local and national economies (R. 18-24). On October 13, 2006, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 7-10).

## II. Statement of Facts

Plaintiff was born on January 4, 1964, making him forty-two years old at the time of the administrative hearing (R. 66). Plaintiff attained a tenth-grade education (R. 64). His past work included that of laborer in the construction business (R. 61).

On December 2, 2003, Plaintiff informed Charlotte E. Menzel, M.D., that he had been diagnosed with emphysema in 2003 and that he had had a pin placed in his left ankle in 1998. Dr. Menzel noted Plaintiff had no problem breathing and that his COPD was controlled with occasional use of Albuterol (R. 153).

On January 19, 2004, Plaintiff presented to Dr. Menzel with swelling and increased fluid in his arms, hands, and feet and numbness in his arms. Plaintiff stated he had reduced range of motion in his ankles. Dr. Menzel diagnosed edema and prescribed Lasix (R. 152).

On January 29, 2004, Plaintiff returned to Dr. Menzel for treatment of edema. Plaintiff reported the condition was reduced in his legs, it was still present in his arms, and that "Lasix didn't seem to help much." Dr. Menzel noted there was not much improvement. Dr. Menzel found the

following: "edema (generalized) vs. wgt. gain (more likely)." She opined that she suspected Plaintiff needed to diet and exercise and that his condition was weight gain that was "stimulated by steroids for asthma" (R. 151).

On February 11, 2004, Plaintiff returned to Dr. Menzel for an examination for his edema. He reported continued stiffness and generalized swelling. Plaintiff stated he experienced bilateral shoulder pain, hand stiffness, wrist pain, hand numbness, reduced grip strength, and wheezes. Dr. Mendel noted edema in Plaintiff's legs; normal ranges of motion in Plaintiff's hips, knees, and ankles; and no joint effusion. Dr. Menzel found Plaintiff was overweight and had rotator cuff tenderness. She opined Plaintiff may have arthralgia, as she "doubt[ed] arthritis" (R. 150).

Plaintiff was admitted to the Emergency Department at West Virginia University Hospitals on February 18, 2004, for swelling and pain in his shoulder. He was instructed to continue taking Naprosyn and to visit his physician in one week (R. 133, 134, 138).

On March 8, 2004, a x-ray was made of Plaintiff's shoulders. An "asymmetric prominence of the left AC joint" was identified and "cortical irregularity [was] noted in the distal clavicles bilaterally, which could be associated with underlying degenerative arthrosis and/or osteolysis." The impression was for "[b]ilateral AC joint changes . . ." (R. 130).

Also on March 8, 2004, Mary Warden, M.D., and Anthony Renzelli, M.D., conducted a follow-up examination of Plaintiff for his swelling and aching in his shoulder (R. 124). Plaintiff reported he experienced bilateral wrist pain and bilateral shoulder pain that was a dull ache. Plaintiff stated his bilateral lower extremity edema had remained the same. Plaintiff's skin, lung, cardiac, HEENT, and neck examinations were normal (R. 124-25). Plaintiff's abdominal examination revealed a distended abdomen and mild tenderness to deep palpation in the right and left upper

3

quadrants. Plaintiff's neurological examination revealed an adequate grip strength, bilaterally, and 5/5 strength in all extremities. Drs. Renzelli and Warden reviewed Plaintiff's February 25, 2004, EMG results, which were for a normal study and no evidence of carpal tunnel syndrome, bilaterally. Drs. Renzelli and Warden diagnosed and recommended the following: asthma treated with Singular, Advair, Combivent; refer to physical therapy for possible arthritis bilateral shoulders, which should be managed with ibuprofen as needed for pain; edema of lower extremities; bilateral hand numbness; and alcohol abuse about which Plaintiff was advised to cease drinking alcohol completely (R. 125).

Plaintiff began physical therapy at Travis Physical Therapy and Sports Medicine, Inc., beginning on March 22, 2004, for shoulder pain. Plaintiff participated in physical therapy for eight weeks, until May 7, 2004, at which time he was discharged and referred back to Dr. Menzel for intermittent back and shoulder pain, with occasional parasthesias in the left hand (R. 141-44).

On April 7, 2004, Plaintiff reported to Dr. Renzelli that he had continued swelling in his arms, shoulders, and legs with pain. Plaintiff stated he felt stiff, especially after sitting or lying down (R. 122). Dr. Renzelli noted Plaintiff's muscle strength was good, he had no joint tenderness, and his straight leg raising test was negative. He prescribed Flexeril and instructed Plaintiff to treat his pain with ibuprofen. Dr. Renzelli advised Plaintiff to continue physical therapy and stay active (R. 123).

On June 4, 2004, G. S. Brar, M.D., F.A.C.P., completed a medical report of Plaintiff upon referral by Dr. Menzel for evaluation of arthralgia (R. 145). Dr. Brar noted Plaintiff's chief complaints were for "bilateral stiffness and arthralgia with subsequent loss of range of motion of both shorters [sic], arthralgia of approximate interphalangeal joints of the right middle and ring finger . . . [and] swelling affecting the fingers and the wrists, morning stiffness 1-2 hours, nocturnal

4

discomfort . . . ." Dr. Brar noted Plaintiff's Lyme disease serology was negative, his rheumatoid factor was normal, his antinuclear antibodies were negative, and his EMG nerve conduction study was normal (R. 158-60, 163-67). Plaintiff's chest, neck, cervical spine, TM joint, cardiovascular, central nervous, and abdominal examinations were normal. Dr. Brar found "moderate arthralgia on abduction and internal rotation of both shoulders, abduction is limited to 90 degrees bilaterally." There was tenderness and bony enlargements in Plaintiff's proximal interphalangeal joints. There was tenderness over Plaintiff's "left lumbar paravertebral area, without evidence of radiculopathy or myelopathy or restriction of range of motion" (R. 145). Plaintiff had a x-ray made of his lumbar spine on June 4, 2004, which revealed "mild to moderate multilevel lumbar spondylolysis, primarily noted at the L5-S1 level." Additionally, "a faint calcification" that was superimposed by the left twelfth rib was present, which was noted as possible "fecal debris" (R. 146). A CT scan was recommended (R. 146-47).

The x-rays made of Plaintiff's sacroiliac joints on June 4, 2004, showed no degenerative changes, no evidence of acute fracture or dislocation, and an unremarkable sacrum (R. 148).

On June 30, 2004, Dr. Menzel noted Plaintiff's June 4, 2004, lumbar spine x-ray was positive for spondylolysis. She ordered a MRI to rule out nerve impingement (R. 149).

On July 9, 2004, Plaintiff underwent a MRI of his lumbar spine, which was positive for "central and left paracentral disc herniation occurring at L4-5" (R. 161).

On July 20, 2004, Plaintiff informed Dr. Menzel that the pain in his left leg was "in the bone." Plaintiff stated he experienced leg numbness and weakness and had to change positions every ten minutes. His shoulder pain was in the acromioclavicular ("AC") joints and he reported weight gain with the use of Prednisone. Dr. Menzel referred Plaintiff to Dr. Douglas (R. 149).

On July 20, 2004, Dr. Menzel completed a General Physical form of Plaintiff for the West Virginia Department of Health and Human Resources. Plaintiff's chief complaints were for back pain, leg pain, shoulder pain, and weak hand grip. Dr. Menzel found Plaintiff had reduced forward flexion of his back and numbness of his left leg. She noted Plaintiff was positive for impingement signs of his shoulders, bilaterally. Dr. Menzel reviewed Plaintiff's July 9, 2004, MRI and noted the findings correlate to his symptoms (R. 154). Dr. Menzil described Plaintiff's pain as follows: low back pain that radiated down left leg, which increased with sitting and standing ; left leg tingling and numbness; shoulder pain that increased with movement and lifting arms over his head; and reduced grip. Dr. Menzel listed her diagnosis of Plaintiff as lumber disc herniation at L4-5, rotator cuff tenderness, and COPD/asthma. She opined Plaintiff was unable to work full time. Dr. Menzel found Plaintiff should avoid lifting and he would be unable to work for six months. She noted Plaintiff should consider conservative treatment, possible "steroid injections" and/or "physical therapy" for treatment of his symptoms. Dr. Menzel opined Plaintiff should be referred to vocational rehabilitation (R. 155).

Plaintiff began treating with George Witney Courtney, D.O., of the Family Medicine Center at United Hospital Center, on August 19, 2004, for shoulder, elbow, and low back pain and for evaluation of possible Lyme disease (191).

On August 27, 2004, Richard A. Douglas, M.D., F.A.C.S., completed a consultative examination of Plaintiff. Plaintiff reported his left leg pain had subsided approximately two weeks earlier, but he had continued low back pain. Plaintiff stated increased activity worsened his pain and that he took no pain medication to relieve his symptoms. Plaintiff stated his gait was unsteady, due to pain (R. 168). Plaintiff's straight leg raising test was negative at ninety degrees bilaterally, with negative internal and external rotation of the femur. Plaintiff's motor, sensory, and deep tendon

reflex examinations were normal (R. 169). Dr. Douglas diagnosed low back pain. Dr. Douglas noted Plaintiff's July 9, 2004, MRI revealed a herniated disc on the left at L4-5, but that Plaintiff had no radicular complaints. Dr. Douglas recommended no surgical intervention for Plaintiff's lumbar spine, but he did recommend additional conservative management in the form of physical therapy, pain management with possible trigger point injections, and Celebrex (R. 171).

On September 23, 2004, Plaintiff presented to Dr. Courtney for a follow-up on his medications. Plaintiff reported dieting and walking, which resulted in reduced swelling in the day, but not at night (R. 186). Plaintiff reported his pain was located in his shoulders, lower back, and legs and that sitting, walking, and working exacerbated his pain (R. 188). Dr. Courtney opined Plaintiff had hyperlipidemia, based on his September 2, 2004, review of Plaintiff's cholesterol and chemical profile, for which he prescribed Zocor; osteoarthritis, for which he instructed Plaintiff to take Tylenol; and asthma, for which he prescribed Advair (R. 167, 201).

On October 28, 2004, Plaintiff presented to Dr. Courtney for a follow-up to his cholesterol treatment. Dr. Courtney noted it was well controlled on Zocor. Plaintiff reported occasional shoulder pain (R. 183). Dr. Courtney continued Plaintiff's prescription for Zocor for treatment of his hyperlipidemia, recommended Plaintiff continue to treat the pain associated with osteoarthritis with Tylenol, and recommended Plaintiff continue to walk for exercise (R. 184).

On December 2, 2004, a x-ray was made of Plaintiff's right ankle. There was no evidence of a fracture; all the bones, joints, and soft tissues were within normal limits (R. 195).

Also on December 2, 2004, a x-ray was made of Plaintiff's left knee. There was no evidence of a fracture; all bones, joints, and soft tissues were within normal limits (R. 196).

On December 30, 2004, Plaintiff presented to Dr. Courtney with complaints of continued

7

ankle, shoulder, and knee pain (R. 175, 177). Dr. Courtney noted Plaintiff moved his ankles without "problems" and had no "erythema or tenderness"(R. 175). Dr. Courtney continued Plaintiff's prescription for Zocor for treatment of hyperlipidemia and recommended Plaintiff continue to diet and to lose five pounds (R. 176).

On January 10, 2005, Dr. Courtney referred Plaintiff to Dr. Lefebure for treatment of recurrent ankle pain (R. 172).

On March 12, 2005, Thomas Lauderman, D.O., a state-agency physician, completed a Physical Residual Functional Capacity Assessment of Plaintiff. He found Plaintiff could occasionally lift and/or carry fifty pounds, frequently lift and/or carry twenty-five pounds, stand and/or walk for a total of about six hours in an eight-hour work day, sit for a total of about six hours in an eight-hour work day, and push/pull unlimited (R. 207). Dr. Lauderman found Plaintiff had no postural, manipulative, visual, or communicative limitations (R. 208-10). Dr. Lauderman found Plaintiff had no environmental limitations, except that he should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation due to asthma (R. 210). Dr. Lauderman reduced Plaintiff's RFC to medium (R. 211).

On February 6, 2006, Charles A. Lefebure, M.D., completed a consultative examination of Plaintiff of an "old fracture, left ankle." Plaintiff informed Dr. Lefebure that he had difficulty with his ankle "giving way, even walking on level ground"; pivoting; and squatting. Plaintiff stated he had to quit his job as a cell-phone tower worker three years earlier due to bilateral ankle pain. Plaintiff stated his activities are limited; if he works on rough or uneven ground or hillsides, he has a moderate limp (R. 215).

Dr. Lefebure's examination of Plaintiff's distal leg and ankle revealed limited motions to

8

Plaintiff's left foot, with dorsiflex at five to ten degrees and plantar flexion at twenty degrees. Sensation in Plaintiff's foot was good. Plaintiff's right ankle and foot moved better than his left, but both had minimal tightness of motions actively (R. 215).

Dr. Lefebure reviewed x-rays Plaintiff had made of both ankles in April, 2005. He opined the x-ray of the left ankle showed "moderate arthritis with narrowing of the joint space, fair amount of evidence of old hardware reaction, no significant spurring or calcifications, interosseous space well maintained." The x-ray of Plaintiff's right ankle showed "a fairly normal appearing bony joint structure." Dr. Lefebure diagnosed Plaintiff with post traumatic degenerative arthritis of the left ankle (R. 215). He suggested various pain control treatment measures to Plaintiff, such as anti-inflammatory medications, nonvigorous walking, and no jumping or pivoting (R. 216).

On February 21, 2006, Plaintiff was examined by a physician at the United Hospital Center's Family Medicine practice. The physician examined Plaintiff relative to his hyperlipidemia and asthma (R. 218). Plaintiff stated he had pain in his shoulders (R. 217). The doctor noted Plaintiff was doing well controlling his high blood pressure with medications; Plaintiff's Zocor dosage was increased (R. 218, 219). Plaintiff had good range of motion bilaterally in his ankles (R. 218).

Administrative Hearing

At the March 29, 2006, administrative hearing, Plaintiff testified he was right handed. He stated he drove approximately twelves miles per week (R. 255). Plaintiff stated he had reduced grip in his hands and that after he worked for "about 15 minutes or so" he had to "quit" to rest (R. 256-57). Plaintiff stated his low back pain was severe for eight hours per day, for which he had to sit or lie down (R. 258). Plaintiff stated his pain was exacerbated by working and moving around. He testified he could walk five hundred feet and stand for about fifteen minutes. Plaintiff stated he

could sit for an hour if he could change positions and he could lift ten pounds (R. 259). Plaintiff testified he had difficulty bending because he would lose his balance; difficulty reaching above his head due to constant pain in his shoulders; difficulty reaching in front because weight will "pull [him] over"; and difficulty crouching because he would lose his balance (R. 259-60). Plaintiff stated he used a cane when he was on his feet for any length of time because his ankles would give out and he would fall (R. 260). Plaintiff testified he had difficulty concentrating and mood changes due to pain (r. 260-61). Plaintiff's sleep was affected by pain, and he slept for three hours per night and took naps two or three times per week (R. 261).

Plaintiff testified he prepared meals, such as a sandwich, vacuumed, mowed the grass with a riding lawnmower, gardened in a small vegetable garden, read books, and hunted "mainly off [his] back porch" five or six times during the past hunting season (R. 262-63, 64). Plaintiff testified he did not visit with friends or relatives and did not belong to any clubs or organizations (R. 263).

Plaintiff stated that after his construction laborer job ended, he did not seek further employment because "it was hard for [him] to get up and go to work . . . and then at the end of the day, [he was] so drugged [sic] down and tired and wore out, it was hard for [him] to do anything around the house" (R. 264).

The ALJ asked the VE the following hypothetical question: "Assume a younger individual with a limited education, precluded from performing all but sedentary work with a sit/stand option, only occasional posturals that, with no hazards, no climbing, clean air. With those limitations, could you describe any work?" (R. 266). The VE responded that there were surveillance system monitor jobs, 1,000 in the regional economy and 300,000 in the national economy, and order clerk for food and beverage jobs, 2,500 in the regional economy and 325,000 in the national economy."

10

The ALJ then asked the VE that if Plaintiff had difficulty concentrating due to pain and was off task one-third to two-thirds of the day, would the above listed jobs be affected? The VE stated the above listed jobs and all other jobs would be eliminated. The ALJ asked the VE that if Plaintiff had to lie down for forty-five minutes, would the jobs be affected? The VE testified the jobs would be removed (R. 267).

Evidence Submitted to Appeals Council

On April 19, 2006, Plaintiff underwent a bronchoscopy at United Hospital Center for recurrent pneumonia and chronic cough (R. 239). The final impression was for "[d]iffuse erythema with inflammation in all major airways suggestion of chronic bronchitis" and "[l]eft lower lobe bronchial washing" (R. 240). The April 20 and 21, 2006, cultures from this procedure showed no significant growth (R. 246, 248).

### III. Administrative Law Judge Decisi§on

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, ALJ Slahta made the following findings:

1. The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3. The claimant's herniated lumbar disc, post traumatic degenerative arthritis of the left ankle, asthma, chronic obstructive pulmonary disease and arthralgia of the shoulders are considered "severe" based on the requirements in the Regulations 20 CFR §§ 404.1520(c) and 416.920(c).

4. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5. The undersigned finds the claimant's allegations regarding his limitations are not

11

fully credible for the reasons set forth in the body of the decision.

6. The claimant has the following residual functional capacity: perform sedentary work in a clean air environment with the option to sit or stand, with only occasional postural movements and no climbing or exposure to hazards.

7. The claimant is unable to perform any of his past relevant work (20 CFR §§ 404.1565 and 416.965).

8. The claimant is a "younger individual" (20 CFR §§ 404.1563 and 416.963).

9. The claimant has "a limited education" (20 CFR §§ 404.1564 and 416.964).

10. The claimant has no transferable skills from any past relevant work and/or transferability of skills is not an issue in this case (20 CFR §§ 404.1568 and 416.968).

11. The claimant has the residual functional capacity to perform a significant range of sedentary work (20 CFR §§ 404.1567 and 416.967).

12. Although the claimant's exertional limitations do not allow him to perform a full range of sedentary work, using Medical-Vocational Rule 201.24 as a framework for decision-making, there are a significant number of jobs in the national economy that he could perform. Examples of such jobs include work as a surveillance systems monitor (1,000 jobs in the region and 300,000 in the nation) and order clerk food (2,500 jobs in the region and 325,000 in the nation).

13. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR §§ 404.1520(g) and 416.920(g)) (R. 22-23).

## IV. Discussion

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v.*

*NLRB*, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

### B. Contentions of the Parties

The Plaintiff contends:

1. The ALJ erred in failing to include any upper extremity limitations despite finding there was a severe impairment.

2. The ALJ failed to perform a proper credibility determination as required by SSR 96-7p because he failed to take into consideration any factor other than daily activities.

   a. The ALJ erred by failing to consider all the factors required to be considered under SSR 96-7p when determining the credibility of a claimant's testimony.

   b. The ALJ erred in finding that Plaintiff's basic activities of daily living supported a finding that a claimant is capable of working a full time sedentary job.

The Commissioner contends:

1. The ALJ properly assessed Plaintiff's RFC.

2. The ALJ properly assessed Plaintiff's credibility.

### C. RFC

Plaintiff contends the ALJ erred in failing to include any upper extremity limitations in his RFC despite finding Plaintiff had a severe impairment. The Commissioner contends the ALJ properly assessed Plaintiff's RFC. Plaintiff asserts that "the ALJ found Plaintiff's 'arthralgia of the shoulders' to be a severe impairment" and, based on that finding, "the limitations from that impairment must be included in the RFC determination and resulting hypothetical question to the VE . . ." (Plaintiff's brief p. 6).

Plaintiff is correct in this assertion. The ALJ found the following in his April 29, 2006, decision: "[t]he medical evidence indicates that the claimant has herniated lumbar disc, post traumatic degenerative arthritis of the left ankle, asthma, chronic obstructive pulmonary disease and arthralgia of the shoulders, impairments that are 'severe' within the meaning of the Regulations . . ." (R. 20).

A residual functional capacity is what a claimant can still do despite his or her limitations. Residual functional capacity is an assessment based upon all of the relevant evidence. It may include descriptions of limitations that go beyond the symptoms, such as pain, that are important in the diagnosis and treatment of a claimant's medical condition. Observations by treating physicians, psychologists, family, neighbors, friends, or other persons as to claimant's limitations may be used. These descriptions and observations must be considered along with medical records to assist the Commissioner in deciding to what extent an impairment keeps a claimant from performing particular work activities. This assessment is not a decision on whether a claimant is disabled but is used as the basis for determining the particular types of work a claimant may be able to do despite his or her impairments. In assessing physical abilities, the Commissioner first evaluates the nature and extent of a claimant's physical limitations and then determines the RFC for work activity on a regular and

14

continuing basis. A limited ability to perform certain physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching) may reduce a claimant's ability to do either past work or other work. When a claimant has a severe impairment that does not meet a listing, the Commissioner will consider the limiting effects of all the impairments in determining his or her residual functional capacity. 20 C.F.R. §§ 404.1545 and 416.945.

The ALJ found that Plaintiff retained the residual functional capacity to "perform sedentary work in a clean air environment with the option to sit or stand, with only occasional postural movements and no climbing or exposure to hazards" (R. 21, 23). The ALJ was required to consider the limiting effects caused by Plaintiff's severe and medically determinable impairments when determining Plaintiff's RFC, but he did not include any limitation in the RFC caused by arthralgia of the shoulders. Even though medical evidence was contained in the record relative to Plaintiff's arthralgia of the shoulders and the ALJ found same to be severe, the ALJ wrote only the following relative to that condition in his decision: "[t]he claimant was treated with physical therapy for bilateral shoulder tendonitis in 2004" and that Plaintiff's "shoulder impairment [did] not approach the level of a listed impairment" (R. 20).

The evidence of record contained medical opinions about the limitations caused by Plaintiff's arthralgia of the shoulders. On June 4, 2004, Dr. Brar found moderate arthralgia on abduction and internal rotation of both shoulders (R. 145). On July 20, 2004, Dr. Menzel diagnosed Plaintiff with impingement signs of both shoulders and she opined Plaintiff's shoulder pain increased with movement and lifting his arms over his head. Dr. Menzel noted Plaintiff had reduced grip. She

found he should avoid lifting (R. 155). The undersigned concludes the ALJ did not give weight to or discount these opinions in determining his RFC, even though he found Plaintiff's arthralgia of the shoulders to be a severe impairment.

The ALJ did not consider Plaintiff's statements concerning his shoulders. Plaintiff repeatedly complained of shoulder pain to his physicians. On February 11 and July 20, 2004, Plaintiff told Dr. Menzel he had bilateral shoulder pain (R. 150, 149). Plaintiff reported swelling and aching in his shoulders to Drs. Warden and Renzelli on March 8 and April 7, 2004 (R. 122, 124). Plaintiff informed Dr. Brar that he had "bilateral stiffness and arthralgia with subsequent loss of range of motion" of both shoulders (R. 145). Plaintiff reported to Dr. Courtney that he experienced shoulder pain on August 19, 2004, September 23, 2004, and December 30, 2004; on September 23, 2004, Plaintiff stated that working exacerbated his shoulder pain; (R. 191, 188, 175, 177). The ALJ did not address these statements as to the limiting effects Plaintiff's arthralgia of the shoulders had on his RFC.

Plaintiff asserts that, based on the ALJ's incomplete RFC, the hypothetical question he posed to the VE is improper (Plaintiff's brief at p. 6). The undersigned agrees; the hypothetical question posed to the vocational expert by the ALJ did not include any limitations that may have been caused by Plaintiff's arthralgia of the shoulders (R. 266-67). The ALJ may rely on VE testimony to help determine whether other work exists in the national economy that the claimant can perform. 20 C.F.R. §§ 404.1566(e), 416.966(e). The Fourth Circuit has held that "[t]he purpose of bringing in a vocational expert is to assist the ALJ in determining whether there is work available in the national economy which the particular claimant can perform." *Walker v. Bowen*, 889 F.2d 47, 50 (1989). When "questioning a vocational expert in a social security disability insurance hearing, the ALJ must

propound hypothetical questions to the expert that are based upon a consideration of all relevant evidence of record on the claimant's impairment." *English v. Shalala*, 10 F.3d 1080, 1085 (4th Cir.1993) (citing *Walker v. Bowen*, 876 F.2d 1097, 1100 (4th Cir.1989)).

If the ALJ poses a hypothetical question that accurately reflects all of the claimant's limitations, the VE's response thereto is binding on the Commissioner. *Edwards v. Bowen*, 672 F. Supp. 230, 235 (E.D.N.C. 1987). The reviewing court shall consider whether the hypothetical question "could be viewed as presenting those impairments the claimant alleges." *English, supra.*

In the instant case, the ALJ asked the VE to identify jobs that an individual could perform who had a "limited education, precluded from performing all but sedentary work with a sit/stand option, only occasional posturals that, with no hazards, no climbing, clean air . . ." (R. 266). The ALJ's hypothetical question did not include any manipulative limitations, specifically reaching or handling (or fingering due to grip) caused by arthralgia of the shoulders, an impairment that was found to be severe by the ALJ. The undersigned finds the ALJ's hypothetical question did not fairly set out all claimant's impairments because it did not include limitations for the severe impairment of arthralgia of the shoulders; therefore, the VE could not express a relevant opinion because that opinion was not based upon consideration of all the evidence in the record.

For the above stated reasons, the undersigned finds the ALJ's determination as to Plaintiff's RFC and his hypothetical question are not supported by substantial evidence.

### D. Credibility

Plaintiff contends that the ALJ erred by failing to consider all the required factors under SSR 96-7p when determining the credibility of Plaintiff's testimony. The Commissioner argues the ALJ properly assessed Plaintiff's credibility.

17

SSR 96-7p reads:

> PURPOSE: The purpose of this Ruling is to clarify when the evaluation of symptoms, including pain, under 20 CFR 404.1529 and 416.929 requires a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effect; to explain the factors to be considered in assessing the credibility of the individual's statements about symptoms; and to state the importance of explaining the reason s for the finding about the credibility of the individual's statements in the disability determination or decision. In particular, this Ruling emphasizes that:

>> 1. No symptom or combination of symptoms can be the basis for a finding of disability, no matter how genuine the individual's complaints may appear to be, unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms.

>> 2. When the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms has been established, the intensity, persistence, and functionally limiting effects of the symptoms must be evaluated to determine the extent to which the symptoms affect the individual's ability to do basic work activities. This requires the adjudicator to make a finding about the credibility of the individual's statements about the symptom(s) and its functional effects.

>> . . .

>> 4. In determining the credibility of the individual's statements, the adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case records. An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence.

SSR 96-7p details the above listed evidence that must be reviewed by the ALJ as follows:

> In recognition of the fact that an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, 20 CFR 404.1529(c) and 416.929(c) describe the kinds of evidence, including the factors below, that **the adjudicator must consider in addition to the objective medical evidence when assessing the credibility of an individual's statements** (emphasis added):
>
> 1. The individual's daily activities;
>
> 2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;
>
> 3. Factors that precipitate and aggravate the symptoms;
>
> 4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
>
> 5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
>
> 6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
>
> 7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

The ALJ made the following credibility finding as to Plaintiff:

The medical evidence of record establishes that the claimant has . . . severe impairments that could reasonably be expected to produce back, ankle and shoulder pain, but [sic] of the intensity or duration as alleged by the claimant. The claimant's allegations of pain are found partially credible. The claimant testified that he can walk 500 feet at a time, stand for 15 minutes at a time, sit for an hour at a time by

changing positions and lift 10 pounds. He said that he uses a cane when he is outside. He still cooks, cleans, vacuums, drives and hunts for deer off his back porch. The claimant's activities suggest that the claimant retains the ability to perform limited forms of sedentary work (R. 20-21).

Defendant, in his brief, noted the ALJ did "discuss the objective findings on page three of his decision" (Defendant's brief at p. 7). That discussion included Dr. Lefebure's February 6, 2006, observation relative to Plaintiff's ankle; the eight-week physical therapy regimen that Plaintiff underwent for his shoulder; the fact that Plaintiff was not participating in ongoing physical for his shoulder; the fact that Plaintiff had undergone conservative treatment for his back condition; Plaintiff's July 9, 2004, lumbar spine MRI, which showed central and left paracentral disc herniation at L4-5; Plaintiff's April, 2005, left ankle x-ray that showed moderate arthritis with narrowing of joint space; and that Plaintiff's asthma and COPD were being treated with medications and did not cause Plaintiff to be hospitalized (R. 20-21). These findings constitute the entire ALJ's evaluation of the objective medical evidence.

As asserted by the Plaintiff, the ALJ based the RFC exclusively on Plaintiff's "activities," which, according to the ALJ, "suggest[ed] that the [Plaintiff] retain[ed] the ability to perform limited forms of sedentary work" (R. 21) and not the kinds of evidence required in SSR 96-79. Specifically, in addition to failing to consider all relevant objective medical evidence, the ALJ failed to consider the location, duration, frequency, and intensity of Plaintiff's pain or other symptoms; factors that precipitated and aggravated the symptoms; the type, dosage, effectiveness, and side effects of any medication Plaintiff had taken to alleviate pain or other symptoms; treatment, other than medication, Plaintiff had received for relief of pain or other symptoms; any measures other than treatment Plaintiff had used to relieve pain or other symptoms; and any other factors concerning Plaintiff's functional limitations and restrictions due to pain or other symptoms.

The ALJ did not consider or evaluate Plaintiff's statements of pain to the physicians who treated or examined him. In his decision, the ALJ did not assess Plaintiff's February 11, 2004, statements to Dr. Menzel that he experienced bilateral shoulder pain, hand stiffness, wrist pain, hand numbness, and reduced grip or his July 20, 2004, statement that his shoulder pain was in his AC joints (R. 150, 149). Plaintiff reported to Dr. Renzelli that his shoulders ached and were swollen on March 8 and April 7, 2004 (R. 124-25, 122). Plaintiff informed Dr. Renzelli that he experienced pain, stiffness, and swelling in his arms and legs (R.123). The ALJ neither considered those statements nor Plaintiff's June 4, 2004, statements to Dr. Brar that he had stiffness, arthralgia, and loss of range of motion in both of his shoulders and morning stiffness (R. 158-60, 163-67). The ALJ did not mention Plaintiff's August 27, 2004, statements to Dr. Douglas that his low back pain continued and his gait was unsteady due to pain (R. 169). Plaintiff's December 30, 2004, complaints of continued ankle, shoulder, and knee pain, made to Dr. Courtney, were not evaluated by the ALJ (R. 175, 177). The ALJ did not consider or evaluate Plaintiff's February, 2006, statements to Dr. LeFebure that he had difficulty walking on level ground, pivoting, or squatting and that he had to quit working three years earlier due to ankle pain (R. 215).

The ALJ did not consider or evaluate those factors that precipitated or aggravated Plaintiff's symptoms. Plaintiff stated, on August 27, 2004, that increased activity worsened his pain (R. 168). On September 23, 2004, Plaintiff stated sitting, walking, and working exacerbated his pain (R. 188). The ALJ also failed to consider or evaluate Plaintiff's testimony that he had to rest after fifteen minutes of doing any work due to pain and that his back pain was severe for eight hours each day, which caused him to either have to sit or lie down to help relieve that pain (R. 256-58). The ALJ did not consider Plaintiff's statement at the administrative hearing that he had difficulty reaching

21

above his head because he experienced constant pain in his shoulders (R. 259-60).

Dr. Renzelli prescribed ibuprofen and Flexeril to manage Plaintiff's pain; Dr. Menzel prescribed Prednisone for Plaintiff symptoms and recommended he undergo steroid injections; and Dr. Courtney prescribed Zocor for Plaintiff's hyperlipidemia, Tylenol for osteoarthritis, and Advair for asthma (R. 125, 123, 149, 155, 167). In his decision, the ALJ did not address any of these treatments or medications prescribed by Plaintiff's treating and examining physicians or the effects, if any, they had on his pain, as required in SSR 96-7p.

Finally, the ALJ did not consider all the relevant objective medical evidence of record in evaluating Plaintiff's credibility. The ALJ opined he would not accord significant weight to the State Agency Physician who opined, on March 12, 2005, that Plaintiff could perform medium work because that opinion was "not supported by the objective medical findings." The ALJ opined he would not accord significant weight to the July 20, 2004, opinion of the physician for the West Virginia Department of Health and Human Resources, who found Plaintiff could not work full time with his current training and skills, because that opinion was a vocational assessment and reserved to the Commissioner (R. 21). Except for the above cited findings as to weight and the ALJ's notation that Dr. Lefebure found Plaintiff had good dorsal pedal pulse in his left foot but a limited range of motion and that Plaintiff may be "headed for joint arthrodesis" (R. 20), the ALJ failed to consider, evaluate, or weigh the opinions expressed by any of Plaintiff's physicians – Drs. Menzel, Warden, Renzelli, Brar, and Lefebure – or the results shoulder x-rays.

The ALJ did not mention any opinion or finding made by Dr. Menzel in his decision. He failed to consider or evaluate Dr. Menzel's finding that Plaintiff had rotator cuff tenderness and possible arthralgia (R. 150). The ALJ did not address Dr. Menzel's July 20, 2004, findings that

Plaintiff had reduced forward flexion of his back and numbness of his left leg; had positive impingement signs of his shoulders; had low back pain that radiated down his left leg and was increased with sitting and standing; had shoulder pain that increased with movement and lifting his arms over his head; had reduced grip; and should avoid lifting (155-55). The ALJ did not consider or evaluate Dr. Menzel's interpretation of Plaintiff's June 4, 2004, x-ray of his of his lumbar spine, which showed spondylolysis (R. 146-47, 149). The ALJ did not mention the results of the examination of Plaintiff conducted by Drs. Renzelli and Warden. He failed to consider and evaluate Drs. Renzelli and Warden's diagnosis of bilateral hand numbness and possible arthritis in Plaintiff's shoulders (R. 125). The ALJ did not mention in his decision the findings or opinions of Dr. Brar. He failed to consider or evaluate Dr. Brar's June 4, 2004, diagnosis of moderate arthralgia on adduction and internal rotation of both shoulders, with limited abduction(R. 145). Dr. Lefebure's observations of limited motions and minimal tightness of motions of Plaintiff's left foot and diagnosis of post traumatic degenerative arthritis of the left ankle were not evaluated or considered by the ALJ (R. 215). Finally, the ALJ did not discuss the March 8, 2004, x-ray made of Plaintiff's shoulders, which showed asymmetric prominence of the left AC joint, cortical irregularity of the distal clavicles, which could be associated with underlying degenerative arthrosis and/or osteolysis (R. 130).

Because the ALJ did not consider all the factors as required by SSR 96-7p in his credibility analysis of Plaintiff and based his decision as to Plaintiff's credibility solely on Plaintiff's activities, the undersigned finds substantial evidence does not support the ALJ's credibility determination.

Plaintiff also argues the ALJ erred in finding that his basic activities of daily living support a finding that Plaintiff is capable of working a full time sedentary job. The Commissioner made no

argument in opposition to this contention. As noted earlier, the ALJ based Plaintiff's RFC on his "activities," which were identified by the ALJ as cooking, cleaning, vacuuming, driving, and hunting for deer off his back porch, and, based on that RFC, the ALJ found Plaintiff was capable of performing a significant range of sedentary work (R. 22). The undersigned has determined that the ALJ's RFC is incomplete because it did not include any limitations for arthralgia of the shoulders, an impairment found to be severe by the ALJ, and did not properly evaluate Plaintiff's credibility in conformance with SSR 96-79 in that he did not adequately consider and evaluate Plaintiff's statements of pain, factors that aggravated Plaintiff's pain, the medication Plaintiff took and its effects, if any, on his symptoms, Plaintiff's testimony as to his functional limitations and restrictions due to pain, or all the relevant objective medical evidence; therefore, it follows that his conclusion that Plaintiff can perform sedentary work is also not supported by substantial evidence.

## VI. RECOMMENDATION

For the reasons herein stated, I find substantial evidence does not support the Commissioner's decision denying the Plaintiff's applications for DIB and for SSI. I accordingly recommend Defendant's Motion for Summary Judgment be **DENIED,** and the Plaintiff's Motion for Summary Judgment be **GRANTED** and this action be **REMANDED** to the Commissioner for further action in accordance with this Recommendation for Disposition.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Frederick P. Stamp, Jr., United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above

will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *Thomas v. Arn*, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this *16* day of *November* , 2007.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE